# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| W.P.  Individually and On Behalf of and as Parent and Natural guardian of E.P. and W.T."H."P., | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| v. | ) ) | Civil No. 04-1562 |
| WESTMORELAND COUNTY, PENNSYLVANIA, WESTMORELAND COUNTY COMMISSIONERS, WESTMORELAND COUNTY CHILDREN'S BUREAU, GERALD SOPKO, MARILYN McSPARRIN, KANDEE LOJAS, RYAN ABEL, KAREN KEMPERT, M.D. & N.D., FOSTER PARENTS, M. JEROME FIALKOV, M.D., WESTMORELAND COUNTY CHILDREN'S BUREAU POLICY MAKERS, JOHN DOE A, JOHN DOE B, ABC CORPORATION DEF, an UNINCORPORATED ASSOCIATION and GHI, a PARTNERSHIP, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) ) ) | |

## Opinion and Order

Plaintiff W.P. commenced this action on behalf of himself and his children, E.P. and W.T."H."P. (collectively referred to as "Plaintiff"), against several Defendants involved in events occurring after Plaintiff requested that the Westmoreland County Children's Bureau's take custody of his children to protect them.  In his Amended Complaint, Plaintiff alleges several civil rights violations as well as state law tort claims.  Presently before the Court are Defendants' motions to dismiss and Plaintiff's responses thereto.

As discussed below, we will grant in part and deny in part the motions to dismiss.

## I. Background

Plaintiff has sued Westmoreland County, Pennsylvania; the Westmoreland County Commissioners; the Westmoreland County Children's Bureau ("WCCB"); the Director of the WCCB, Gerald Sopko; the Assistant Director of the WCCB, Marilyn McSparrin; a Case Worker Supervisor of the WCCB,  Kandee Lojas; a Case Worker of the WCCB, Ryan Abel; and a supervisor of the WCCB's Foster Parents, Karen Kempert (collectively "the WCCB Defendants"). In addition, Plaintiff has sued the foster parents, M.D. & N.D., where the children were placed by the WCCB.  Plaintiff has also filed suit against M. Jerome Fialkov, M.D., who evaluated Plaintiff and his children and issued a report pursuant to the direction of the WCCB and Order of Court. Finally, Plaintiff sues unnamed Defendants the WCCB Policy Makers; John Doe A and John Doe B; ABC Corporation; DEF, An Unincorporated Association; and GHI, a Partnership**.**

.    **A. Plaintiff's Allegations**

On July 9, 2002, Plaintiff, W.P., the father of E.P. and W.T."H."P., his minor children, telephoned the Westmoreland County Children's Bureau ("WCCB") requesting assistance as he did not believe he could ensure his children's safety from an individual who had been threatening him. (Am. Compl. ¶ 29.)  The WCCB took custody of the children on July 9, 2002, placing them with a foster family, and scheduling a shelter care hearing for July 11, 2002.  (Am. Compl. ¶¶ 29, 30, & 31.)  During the relevant time period the children were 8 and 11 years of age.  (Am. Compl. ¶ 1.)

### Events Prior to the July 9, 2002 Telephone Call

Prior to the July 9, 2002 telephone call to the WCCB, Plaintiff and his children had been temporarily living in a hotel in Hempfield Township, Westmoreland County, Pennsylvania.  (Am. Compl. ¶ 20.)  The family was waiting for repairs to be completed on a leased house in Ligonier Township, Westmoreland County, Pennsylvania.  (Am. Compl. ¶ 20.)  The family had moved out of their Hempfield Township home where Plaintiff's wife, and mother of the children, had committed suicide on October 30, 2001, following a lengthy illness.  (Am. Compl. ¶ 17.)

While Plaintiff's wife was ill, he had employed an individual to help out with household repairs.  (Am. Compl. ¶ 21.)  Plaintiff occasionally gave this person financial assistance, and after his wife died the individual began harassing Plaintiff for additional financial assistance.  (Am. Compl. ¶ 22-23.)  Plaintiff eventually began to believe that this individual was a threat to the safety of his children.  (Am. Compl. ¶ 25.)

Plaintiff was unable to sleep in the two days before his call to the WCCB.  (Am. Compl. ¶ 28.)  During these two days he believed he saw the individual in a vehicle near where the children took a bus for day camp and he also received a telephone call threatening the children's safety.  (Am. Compl. ¶ 28.)  In addition, Plaintiff was being treated by a psychiatrist and psychologist regarding his wife's death, and was taking Paxil, prescribed by his primary care physician.  (Am. Compl. ¶ 26.)  It was learned later that Plaintiff had an adverse reaction to Paxil that resulted in sleeplessness, increasing worry, increasing agitation, and induced a manic episode.  (Am. Compl. ¶ 27.)  These symptoms rapidly diminished after Plaintiff stopped taking Paxil.  (Am. Compl. ¶ 27.)

### The Hearings and Evaluations

Plaintiff appeared at the July 11, 2002 shelter hearing representing himself and testifying that he believed he could keep his children safe.  (Am. Compl. ¶ 31.)  Following a full hearing the Court determined that the children should remain in the custody of the WCCB, with Plaintiff having one-hour per week visits at the WCCB office.  (Am. Compl. ¶ 31-32.)  The children thus remained with the foster family until physical custody over the children was returned to the father on October 10, 2002.  (Am. Compl. ¶¶ 30, 83.)

Beginning August 20, 2002, Plaintiff's visits with his children increased to two evenings a week, as well as Saturdays and Sundays.  (Am. Compl. ¶ 36.)  Transportation for the visits, as well as for transporting the children to school in Ligonier Township where Plaintiff then resided, was conducted by Spectrum Family Services.  (Am. Compl. ¶¶ 34-36.)

At the July 11, 2002 shelter hearing Plaintiff agreed to undergo a psychiatric examination and the Court ordered that the examination take place as soon as possible.   The examination was

conducted by Defendant M. Jerome Fialkov, M.D., sometime in August, 2002.  A dependency hearing was scheduled for August 19, 2002, which would have been Plaintiff's first opportunity to present evidence that he was capable of caring for his children.  On August 16, 2002, Dr. Fialkov provided his recommendation that the children should be evaluated.  Based on Dr. Fialkov's recommendation, the August 19, 2002 dependency hearing was necessarily continued by consent of all parties until October 3, 2002 at 10:30 a.m.  (Order of Court, August 19, 2002, attached as Pl.'s Ex. 1 to Plaintiffs' Response in Opposition to M. Jerome Fialkov's Motion to Dismiss (hereinafter "Plaintiffs' Response to Fialkov").)

In the August 19, 2002 Order of Court, Dr. Fialkov was ordered to conduct evaluations of the children during the week of August 26, 2002, and to provide a verbal recommendation within one week of the evaluations.  (Id., at ¶ 1.)  Dr. Fialkov conducted the evaluations of the children on September 5, 2002, and recommended that the children be provided with therapy.

On his own, Plaintiff arranged for psychological evaluations of himself and his children to be conducted on September 7, 2002, by Dennis W. Kreinbrook, Ph.D.  (Report of Dr. Kreinbrook, attached as Pl.'s Ex. 2 to Plaintiffs' Response in Opposition to Motion to Dismiss Filed on Behalf of All Identified Defendants except M. Jerome Fialkov, M.D. (hereinafter "Plaintiffs' Response to WCCB Defendants").)  Dr. Kreinbrook, consistent with Dr. Fialkov, recommended that the children receive counseling (Id. at 4.)

Plaintiff then arranged for his children to begin the needed therapy with Dr. Kreinbrook on September 28, 2002.  On September 26, 2002, however, counsel for Plaintiff learned that the WCCB had arranged for the children to be evaluated by William A. Sorrells, M. Ed.  Plaintiff was told that the children must proceed with therapy as arranged by the agency, rather than the therapy scheduled with Dr. Kreinbrook.

Mr. Sorrells evaluated the children on September 27, 2002, and issued a report on October 3, 2002.  He too recommended that the children receive counseling.  Mr. Sorrels felt he could conduct

counseling with E.P, but he recommended that H.P., the younger child, attend counseling with a person qualified in treating younger children.

Mr. Sorrells began counseling with E.P. on October 8, 2002.  No other appointments were scheduled for E.P. until Plaintiff himself called Mr. Sorrells.  Finally, on October 18, 2002, appointments were made for E.P. for individual counseling on October 25, 2002, and for the family on October 28, 2002.  The younger child, H.P., was not scheduled for any counseling until November 7, 2002, in part because the chosen therapist was on vacation when the agency first contacted him.

All parties were present for the October 3, 2002 hearing, however, the hearing was continued over the objection of Plaintiff because an earlier hearing had taken up the time set aside for Plaintiff's hearing and the Court had other hearings scheduled for later in the day.   The Court set aside the entire day of October 10, 2002 for the rescheduled hearing.

At the October 10, 2002 hearing, the Judge explained in open court that the Judge, Dr. Fialkov, the parties, and counsel had engaged in "extensive discussions" resulting in an agreement regarding dependency.  (Transcript of October 10, 2002 Hearing, at 3, attached as Pl. Ex. 10 to Plaintiff's Documents in Opposition to Motion to Dismiss.)  Based on this agreement the Court found that there was clear and convincing evidence that the children are dependent and in need of services, but that the children could be returned to their home with their father.  ( Id. at 9-10.)

Because of the delay in getting treatment for his children, Plaintiff filed a motion to obtain the recommended therapy and counseling for his children.  ("Motion to Allow [Father] to Obtain Recommended Counseling and Therapy for his Children in a Timely Manner," attached as Pl.'s Ex. 3 to Plaintiffs' Response to WCCB Defendants.)  A hearing on the motion was held on October 31, 2002.   The Judge denied Plaintiff's motion without prejudice in light of the fact that therapy had started for E.P. and was going well, and therapy for H.P. was scheduled for November 7, 2002. (Transcript of October 31, 2002 motion hearing, at 14, attached as Pl. Ex. 4 to Plaintiffs' Response to WCCB Defendants.)

### *The Foster Family and the WCCB's Insufficient Response*

Plaintiff alleges that both children complained to Defendant Ryan Abel about the foster family, but that Mr. Abel failed to address the complaints. (Am.Compl., at ¶ 57.) Among other things, the children complained to Mr. Abel that the biological children in the home physically and verbally assaulted them. (Am.Compl., at ¶ 57.)

On August 26, 2002, shortly after Spectrum began transporting the children for supervised visits with their Father, the Foster Mother told Spectrum's visitation supervisor, James Henley, that she was not going to let the children's visits get in the way of her life. (Am.Compl., at ¶ 61.) Mr. Henley contacted Plaintiff on August 27, 2002, and told him that "he had grave concerns about the foster home" and that he was going to inform the WCCB of his concerns. (Am.Compl., at ¶ 62.) Plaintiff also alleges that at some unspecified time the Foster Mother hung up the telephone on Mr. Henley when he called her. (Am.Compl., at ¶ 63.)

Spectrum employees provided regular written reports to Mr. Henley, which were also provided to the WCCB. (Am.Compl., at ¶ 58.) Some of these reports showed that the children were telling the Spectrum employees about problems in the foster home. (Am.Compl., at ¶ 63.)

At one time or another the children reported either to Spectrum employees or someone else the following problems about the foster home:

- the foster mother told the children not to tell anyone about anything that happened in the foster home or to make any complaints;

- that the biological children in the home were "ticked off" at the children for getting them in trouble;

- that H.P. was repeatedly threatened not to talk to or complain to anyone about the foster home;

- that the children did not feel safe in the home;

- that their money and belongings were missing;

- the foster mother showed favoritism to her youngest biological daughter;

- the foster mother made fun of and humiliated E.P.;

- the foster mother threatened not to feed the children;

• H.P. was either threatened with being put in a closet, or actually was put in a closet;

• the children were not allowed privacy in their bedrooms or bathrooms;

• the foster mother told the children to stop complaining to the WCCB about the home;

• the foster mother told H.P. that she would starve him and tell the WCCB that he had run away; and

• the foster mother told H.P. to stop complaining about the other boys watching televison late at night in his room or else the television would be left on all night.

(Am.Compl., at ¶¶ 64-65)

Defendant Sopko was informed as of September 13, 2002, of problems with the foster parents, the caseworker, his supervisor, the foster parent supervisor, and Mr. Henley's concerns about the foster home.  (Am.Compl., at ¶¶ 66-68.)

On September 16, 2002, the caseworker supervisor, Kandee Lojas, informed Mr. Henley of new rules effective immediately due to the stress on the foster parent.  (Am.Compl., at ¶ 69; Letter from Lojas to Henley, attached as Pl.'s Ex. 7 to Plaintiffs' Response to WCCB Defendants.)  Ms. Lojas explained that henceforth the Spectrum employee is not permitted in the foster home and is not permitted to discuss the foster parents with the children.  (Id.)  In addition, Ms. Lojas informed Mr. Henley that the children were going to be advised not to discuss the foster parents or the foster home with the Spectrum employee.  (Id.)

Because of these problems Plaintiff filed a motion on September 24, 2002, to remove the children from the foster home.  ("Petition to Remove E.P. and H.P. from Placement in the Foster Home," attached as Pl.'s Ex. 6 to Plaintiffs' Response to WCCB Defendants.)  Argument on the motion was scheduled for the October 3, 2002 hearing, which was continued to October 10, 2002. The issue was rendered moot when the Court returned the children to the Father at the October 10th hearing.

After regaining physical custody of his children, Plaintiff and his children continued with the WCCB arranged therapy through the end of 2002.  ON January 9, 2003, the Court returned full legal custody of the children to Plaintiff.  (Am. Compl. ¶¶ 53, 84.)

### B. Claims Asserted

Plaintiff does not base any of his claims on the facts or circumstances regarding the WCCB's actions in response to his initial telephone call on July 9, 2002. That is, Plaintiff does not base any claim on the fact that the WCCB initially took custody of his children. Nor does Plaintiff object to the Court's ruling after the July 11, 2002 shelter hearing that the children should remain in the custody of the WCCB. Plaintiff's Amended Complaint instead focuses broadly on the Defendant's actions with regard to delay in proceeding with hearings, evaluations, and therapy on one hand, and Defendant's actions with regard to conduct occurring at the foster home on the other hand. Specifically, Plaintiff asserts the following claims in a nine-Count Amended Complaint.

In Count I, Plaintiff asserts a 42 U.S.C. § 1983 civil rights action against all Defendants alleging that they violated his and/or his children's rights to liberty, and procedural and substantive due process under the First, Fourth, and Fourteenth Amendments to the United States Constitution. (Am. Compl. ¶¶ 88-100.) Specifically, Plaintiff claims that all Defendants violated

- the children's substantive due process right to placement in an appropriate, safe setting;

- the family's liberty interest in family integrity, familial associations and the right to freedom of intimate associations;

- the family's right to live where they choose;

- the children's right to appropriate therapeutic and counseling services in a timely manner;

- the children's First Amendment right to freedom of protected speech; and

- the children's right to be secure in their persons and property.

In addition, in Count I, Plaintiff alleges municipal liability against the Defendants stating that they acted pursuant to a

. . .well-established custom and/or policy of the municipal defendants, . . ., to fail and refuse to seriously investigate and act on complaints about foster placements and to use the implicit threat of prolonged placement of children outside of their parent's custody if the parent questions the decisions or authority of the Defendants.

(Am. Compl. ¶ 98.)

8

In Count II, Plaintiff asserts a 42 U.S.C. § 1985 civil rights conspiracy claim against all Defendants alleging that they violated his and/or his children's rights to liberty, and procedural and substantive due process under the First, Fourth, and Fourteenth Amendments to the United States Constitution.  (Am. Compl. ¶¶ 101-107.)  In Count III, Plaintiff asserts that all Defendants deprived the family of their rights under Article 1, Sections 1, 9, and 13 of the Pennsylvania Constitution. (Am. Compl. ¶¶ 108-109.)

In Count IV, Plaintiff asserts a state law claim of intentional and negligent infliction of emotional distress against the foster parents, M.D. and N.D., for their outrageous acts and omissions that caused the children emotional distress manifesting as crying, fear and anxiousness, anger, stomach upset and other discomforts.  (Am. Compl. ¶¶ 110-112.)  In Count V, Plaintiff asserts a state law claim of invasion of privacy against the foster parents for violating the children's reasonable expectation of privacy. (Am. Compl. ¶¶ 113-116.)  In Count VI, Plaintiff asserts a state law claim of intentional and negligent infliction of emotional distress against Kandee Lojas, Ryan Abel, Gerald Sopko, Marilyn McSparrin, and M. Jerome Fialkov, for their malicious and outrageous acts and omissions, which amounted to willful misconduct.  (Am. Compl. ¶¶ 117-118.)

In Count VII, Plaintiff seeks punitive damages against Kandee Lojas, Ryan Abel, and the foster mother M.D.  (Am. Compl. ¶¶ 119-121.)  In Count VIII, Plaintiff seeks Special Damages in the form of counsel fees and expenses against all Defendants.  (Am. Compl. ¶¶ 122-123.)  Finally, in Count IX, Plaintiff seeks an award of attorney fees and expenses against all Defendants.  (Am. Compl. ¶¶ 124-125.)

The WCCB Defendants and the foster parents have filed a motion to dismiss (Doc. 11), with brief and documents in support (Doc. 12).  M. Jerome Fialkov has also filed a motion to dismiss (Doc. 7), with brief and documents in support (Doc. 8).  Plaintiff has responded to both motions with briefs and documents in support (Docs. 14,  15, 16, 17 & 18).  The WCCB Defendants and foster parents filed a reply to Plaintiff's response (Doc. 19), to which Plaintiff filed a sur-reply (Doc. 20.)

## II.  Standard of Review

Defendants bring their motions to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6).  A motion to dismiss pursuant to Federal Rule 12(b)(6), tests the legal sufficiency of the complaint.  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  A court must determine whether the party making the claim would be entitled to relief under any set of facts that could be established in support of the claim.  Hishon v. King & Spalding, 467 U.S. 69, 73 (1984) (citing  Conley, 355 U.S. at 45-46); see also Wisniewski v. Johns- Manville Corp., 759 F.2d 271, 273 (3d Cir.1985). "A motion to dismiss pursuant to 12(b)(6) may be granted only if, accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief."  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1420 (3d Cir. 1997).  While a court will accept well-pleaded allegations as true for the purposes of the motion, it will not accept legal or unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations.  See Miree v. DeKalb County, Ga., 433 U.S. 25, 27 n.2 (1977).

"When deciding a motion to dismiss, it is the usual practice for a court to consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 259 (3d Cir. 1998) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357  (2d ed.1990)); see also Rogan v. Giant Eagle, Inc., 113 F. Supp.2d 777, 782 (W.D. Pa. 2000).  "'Documents that the defendant attaches to the motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the claim; as such, they may be considered by the court.'"  Pryor v. NCAA, 288  F.3d 548, 560 (3d Cir. 2002) (quoting 62 Fed.Proc., L.Ed. § 62:508).

Here, both parties have attached documents to their pleadings, primarily undisputed court documents concerning the child custody proceedings, which we may consider.  In addition, Plaintiff has attached a document entitled "Needs-Based Plan" for the Westmoreland County Children and Youth Services and Juvenile Justice Services for the years 2003-2004 and 2004-2005.  (Pl.'s Ex. 1,

attached to <u>Plaintiffs' Response to WCCB Defendants</u> and to <u>Plaintiffs' Sur-Reply</u>.)  We agree with

Defendants that this document is clearly extrinsic to the motion to dismiss record and we will not

rely on it in our ruling.  (<u>Defendants' Reply to Plaintiffs' Brief Response</u>, at 2-3.)

## III.  Discussion

The WCCB Defendants and foster parents and Dr. Fialkov seek dismissal of all claims

asserted against them for failure to state a claim upon which relief can be granted.

### A.  Dr. Fialkov's Motion to Dismiss

Dr. Fialkov has filed a separate motion to dismiss, in which he presents well-reasoned

arguments for dismissal of all claims against him.  Dr. Fialkov moves for dismissal of the

constitutional claims asserted against him by arguing that Plaintiff has failed to specifically allege

that he violated any constitutional rights.  Plaintiff's response to these arguments is minimal, largely

relying on reference to his Amended Complaint and to his response to the other Defendants' motion

to dismiss.  We agree with Dr. Fialkov that the Amended Complaint fails to support Plaintiff's

claims that Dr. Fialkov violated Plaintiff's constitutional rights asserted under the First, Fourth, and

Fourteenth Amendment.

Specifically, Plaintiff makes the following allegations that refer to Dr. Fialkov:

> 38.  On or about August 1[6], 2002 M. Jerome Fialkov, a psychiatrist employed by
> the WCCB recommended that the Children be evaluated to determine if they required
> counseling or therapeutic services.  Thereafter he evaluated the Children and
> recommended certain therapies/counseling.  Since Dr. Fialkov's report was not
> provided until August 1[6], 2002, Father had to consent to the August 19, 2002
> hearing being continued until October 3, 2002. . . . .
>
> * * *
>
> 46.  The Defendants contracted with M. Jerome Fialkov to perform psychiatric
> custody evaluations and make recommendations concerning all three Plaintiffs.
>
> 47.  The Defendants' contract with M. Jerome FIalkov requires that he provide
> reports within a certain time period subsequent to his evaluations.
>
> 48.  The Defendants' have the ability to sanction M. Jerome Fialkov for failure to
> perform his contractual duties, including failing to provide reports in a timely
> manner.

11

49.  The importance of providing timely reports is self-evident - if therapies or counseling is needed, as the WCCB maintains that it has the sole right to control evaluations and provision of therapies - therapies and counseling should begin as soon as possible and not be delayed due to a delay in M. Jerome Fialkov providing [a] report.

50.  In this case M. Jerome Fialkov's failure to comply with contractual deadlines was pointed out to the Defendants and they did nothing about it.

51.  In this case M. Jerome Fialkov was under Court Order to perform evaluations of the Children by a date certain.  M. Jerome Fialkov did not do this.

52.  M. Jerome Fialkov's diagnosis of Father in this case included a diagnosis that does not even appear in the D.S.M. IV as published in the United States and was factually incorrect - none the less the Defendants continued to employ M. Jerome Fialkov on this case,

53.  All the Defendant acts and omissions in regard to evaluation and therapy for the Children and scheduling hearings appropriately and timely was in reckless disregard of Plaintiffs' rights and lengthened the time the Children were in foster placement and the time period the Children remained in the custody of the WCCB until January 9, 2003.

These allegations do not state a claim upon which relief could be granted that Dr. Fialkov violated Plaintiff's constitutional rights.

Plaintiff alleges that Dr. Fialkov evaluated Plaintiff and his children, produced a report, and provided recommendations regarding therapy and treatment.  Plaintiff does not take issue with Dr. Fialkov's recommendation that the children be evaluated, or with his later recommendation that the children receive therapy.  In fact, his own doctor recommended that the children receive therapy. Thus, Plaintiff's allegation of a constitutional violation rests on his claims that Dr. Fialkov did not perform timely evaluations and issued late reports and recommendations.  Plaintiff makes the bare allegation that Dr. Fialkov intentionally did not comply with the Court's orders and that his actions were willful and outrageous.  We find that such a bare allegation is nothing more than Plaintiff's attempt to assert a legal conclusion cast in the form of a factual allegation that we will not credit.

At the July 11, 2002 shelter hearing, Plaintiff agreed to undergo a psychiatric examination, and the Court ordered that the examination take place as soon as possible.  Dr. Fialkov performed the evaluation sometime in early August.  In his report, provided on the Friday before the August 19th hearing, he recommended that the children be evaluated.

12

In the August 19, 2002 Order of Court, Dr. Fialkov was ordered to conduct evaluations of the children during the week of August 26, 2002, and to provide a verbal recommendation within one week of the evaluations.  Dr. Fialkov evaluated the children on September 5, 2002, three working days after the Court ordered deadline of August 30, 2002 (September 2, 2002 was Labor Day).  He recommended that the children receive therapy.  His written report was issued on September 24, 2002.

Plaintiff provides no factual allegations to support a constitutional claim against Dr. Fialkov.  According to both parties, Dr. Failkov's initial evaluation of Plaintiff occurred in early August.  He recommended that the children be evaluated.  He provided this recommendation on the eve of the August 19th hearing.  Plaintiff had to be extremely disappointed to discover at the eleventh hour that the hearing would be continued and that his children would not be returned to him on August 19th.  However, the fact that the recommendation came just prior to the hearing does not rise to the level of a constitutional violation.  Significantly, even if Dr. Fialkov had given his recommendation earlier, Plaintiff's children were still not going to be returned to Plaintiff until after an evaluation was performed.

Plaintiff's complaint that Dr. Fialkov did not evaluate the children by the date ordered by the Court also does not rise to the level of a constitutional violation.  The evaluation was conducted only three working days after the deadline, which is insufficient by itself to support Plaintiff's claims.

In addition, when Dr. Fialkov conducted the evaluations and  gave his recommendation is not relevant to Plaintiff's real complaint against the WCCB Defendants.  Plaintiff does not challenge the substance of Dr. Fialkov's evaluation or the recommendation, in fact his chosen doctor gave the same recommendation.  It was the WCCB Defendants who continued the August 19th hearing, and it was the WCCB Defendants who failed to arrange and provide the recommended therapy in a timely manner.  Even if Dr. Fialkov's late actions necessarily delayed the WCCB Defendant's in beginning their process, the delay attributed to Dr. Fialkov is measured at most in days and cannot establish a constitutional violation.  Even after Dr. Fialkov had evaluated the children and recommended

13

therapy, it was "the WCCB had not put any contract in place with any provider to perform evaluations or provide treatment to the Children" as of mid-September 2002.  (Am. Compl., at ¶ 38.) It was the WCCB Defendants who told Plaintiff not to proceed with therapy with Dr. Kreinbrook, and it was those Defendants who failed to provide timely therapy to the children during the month of October.

We note that Plaintiff does not explain how the events would have been different had Dr. Fialkov issued his recommendation earlier.  As noted, at most it would have moved the events up a few days but otherwise would not have affected the timing of when Plaintiff's children were returned to him, or when the Court would have returned full legal custody to Plaintiff.

While we permit some of Plaintiff's constitutional claims to proceed against other defendants this is due in large part to the WCCB Defendants' failure to adequately address the averments of the Amended Complaint and in part to the fact that at this stage of the proceedings Plaintiff's claims are supported by his allegations against the WCCB Defendants.   Plaintiff's Amended Complaint fails to state a constitutional claim against Dr. Fialkov upon which relief can be granted.  Accordingly, we will grant Dr. Fialkov's motion to dismiss Plaintiff's constitutional claims against him.

Plaintiff's Amended Complaint also does not support his state law torts claims and section 1985 claim asserted against Dr. Failkov.  We address those arguments later in this Opinion.  We turn now to Plaintiff's constitutional claims asserted against the other Defendants.

**B.  Failure to State an Actionable Constitutional Claim**

Defendants argue that Plaintiff has failed to state any constitutional claim upon which relief can be granted.

### 1.  Fourteenth Amendment Procedural and Substantive Due Process Claims

With regard to a substantive due process claim the United States Supreme Court has explained that """the touchstone of due process is protection of the individual against arbitrary action of government.""" County of Sacramento v. Lewis, 523 U.S. 833, 845 (1998)(quoting Wolff

v. McDonnell, 418 U.S. 539, 558 (1974)).  With regard to a procedural due process claim the "fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  Miller v. City of Philadelphia, 174 F.3d 368, 373 (3d Cir. 1999) (citation omitted).

### a.  Substantive Due Process

Plaintiff alleges a variety of rights deprived him and his children by the actions of the Defendants.  Plaintiff first claims violations of rights centered around the familial relationship, such as the family's liberty interest in family integrity and, familial associations, the right to freedom of intimate associations, and right to live where they choose.

The United States Court of Appeals for the Third Circuit recognized this liberty interest in familial integrity described as "the constitutionally protected liberty interests that parents have in the custody, care and management of their children."  Croft v. Westmoreland County Children & Youth Serv., 103 F.3d 1123, 1125 (3d Cir. 1997), see also Santosky v. Kramer, 455 U.S. 745, 753 (1982).  "The Due Process Clause of the Fourteenth Amendment prohibits the government from interfering in familial relationships unless the government adheres to the requirements of procedural and substantive due process."  Croft, 103 F.3d at 1125.  "This interest, however, must be balanced against the state's interest in protecting children suspected of being abused."  Miller, 174 F.3d at 373 (citing Croft, 103 F.3d at 1125; Millspaugh v. County Dept. of Public Welfare, 937 F.2d 1172, 1175-77 (7th Cir. 1991)).  "The right to familial integrity, in other words, does not include a right to remain free from child abuse investigations."  Croft, 103 F.3d at 1125 (citation omitted).

Plaintiff also alleges that the Defendant's violated the children's right to placement in an appropriate, safe setting, or more generally the children's right to be safe from harm while in the custody of the state.  In his Brief, Plaintiff also argues that the Defendants had actual knowledge of the serious risk of danger to the children, and that they violated the children's rights under a state created danger theory.  (Plaintiff's Brief In Opposition to WCCB Defendants, at 15, citing Deshaney v. Winnebago County Department of Social Services, 489 U.S. 189, 195 (1989).)

Defendant's argue that Plaintiff's substantive due process claim must fail based upon the Plaintiff's own conduct in contacting the WCCB and asking for help to protect his children. (Defendants' Brief in Support of Motion to Dismiss, at 12-14.)   The case law supporting Defendants' argument does indeed compel dismissal of such a claim if it would have been raised. (Defendants' Brief in Support, at 13-14, citing Martinez v. Mafchir, 35 F.3d 1486, 1490 (10th Cir. 1994 (We are unsure why Defendants cite a single case from the Tenth Circuit when there is ample applicable case law in our own circuit)).  There is no dispute that "the information available to the defendants at the time" Plaintiff's children were taken into custody "created an objectively reasonable suspicion" that the children were in imminent danger of harm justifying the interference with the parent-child relationship.  Adkins v. Luzerne County Children & Youth Services, 2005 U.S. Dist. LEXIS 19006, at *16-17 (3d Cir. September 2, 2005)(citing Croft, at 1126).  As already noted, however, Plaintiff does not base any aspect of his claims on the fact that the Defendants initially took custody of his children.

Plaintiff instead complains of the alleged harm his children suffered at the foster home while in the custody of the WCCB, and of the harm resulting from the WCCB Defendants failure to arrange and provide for necessary therapy.  Plaintiff also asserts that the WCCB Defendants failure to timely proceed with hearings and medical evaluations necessarily lengthened the amount of time the children were in the foster home.  In addition, Plaintiff claims that the WCCB Defendants continued the children's placement in a foster home without taking action when they knew the children were being harmed or were at risk of being harmed. Plaintiff asserts that all of the above contributed to the claims that the Plaintiff and his children's constitutional rights were being violated.  Defendants' motion to dismiss and brief in support do not address these claims.

The United States Court of Appeals for the Third Circuit has explicitly held "that when the state places a child in state-regulated foster care, the state has entered into a special relationship with that child which imposes upon it certain affirmative duties."  Nicini v. Morra, 212 F.3d 798, 808 (3d

Cir. 2000). "The failure to perform such duties can give rise, under sufficiently culpable circumstances, to liability under section 1983. Id.

"When executive action is at issue, a violation of the Fourteenth Amendment right to substantive due process may be shown by conduct that 'shocks the conscience.'" A.M. v. Luzerne County Juvenile Det. Ctr., 372 F.3d 572, 579 (3d Cir. 2004) (quoting Lewis, 523 U.S. at 846-47). "Negligent conduct is never egregious enough to shock the conscience, but conduct intended to injure most likely will rise to the level of conscience-shocking." A.M.,372 F.3d at 579 (citing Lewis, 523 U.S. at 849). "In between these two extremes is a middle range of conduct known as deliberate indifference, which may rise to the level of conscience-shocking in certain circumstances." A.M., 372 F.3d at 579 (citing Lewis, 523 U.S. at 849-50).

For liability to attach in a section 1983 claim challenging a social worker's decision to remove a child from a parent, "'the standard of culpability for substantive due process purposes must exceed both negligence and deliberate indifference, and reach a level of gross negligence or arbitrariness that indeed "shocks the conscience.""" Ziccardi v. City of Philadelphia, 288 F.3d 57, 64 (3d Cir. 2002)  (quoting Miller, 174 F.3d at 375-376.)  This is the standard cited by Defendants in arguing that Plaintiff cannot state a section 1983 claim because the decision to remove the children based on the father's request does not shock the conscience.  As already discussed, Plaintiff does not assert such a claim, and instead bases his claims on the children's placement in the foster home.

The Court of Appeals for the Third Circuit has explained the appropriate standard to be used in situations, like the instant case, where a caseworker has "time to make unhurried judgments in deciding whether to permit the [children] to remain in the home." Ziccardi, 288 F.3d at 64 (quoting Nicini, 212 F.3d at 807).  An analogous situation occurred in Nicini, and the Court of Appeals explained that in Nicini, "[w]e . . .  distinguished Miller and held that a standard of deliberate indifference was appropriate." Ziccardi, 288 F.3d at 64 (quoting Nicini, 212 F.3d at 810-811).

The present case is similar. The children were in a custodial situation where "'forethought about [the foster child's] welfare is not only feasible but obligatory.'" A.M., 372 F.3d at 579 (citing Lewis, 523 U.S. at 851). The persons responsible for the children, including not only the foster parents, but also the WCCB employees, "had time to deliberate concerning [the children's] welfare." A.M., 372 F.3d at 579 (citing Leamer v. Fauver, 288 F.3d 532, 547 (3d Cir. 2002)). Thus, the deliberate indifference standard is appropriate in this case. However, as Defendant fails to address Plaintiff's actual claims, we will deny Defendant's motion to dismiss Plaintiff's substantive due process claims for failure to state a claim upon which relief can be granted.

### b. Procedural Due Process

The United States Court of Appeals for the Third Circuit explained the applicable law for a procedural due process claim as follows:

> "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' " Mathews v. Eldridge, 424 U.S. 319, 333, 96 S. Ct. 893, 902, 47 L. Ed. 2d 18 (1976) (quoting Armstrong v. Manzo, 380 U.S. 545, 552, 85 S. Ct. 1187, 1191, 14 L. Ed. 2d 62 (1965)). Assessing whether due process has been given involves a weighing of the factors set forth by the Supreme Court in Mathews:
>
> > first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
>
> Id. at 335, 96 S. Ct. at 903.

Miller, 174 F.3d at 373. "'Due process is flexible and calls for such procedural protections as the particular situation demands.'" Mathews, 424 U.S. at 334 (Morrissey v. Brewer, 408 U.S. 471, 481 (1972)).

The private interest at stake is of course the fundamental liberty interest of natural parents in the care, custody, and management of their child. Croft, 103 F.3d at 1125. This interest must be balanced by the state's interest in protecting children suspected of being abused. Id. In this case, the

18

children were never suspected of being abused, but were found to be in danger of harm based on the father's telephone call on July 9, 2002.

Plaintiff claims that he alleges "procedural due process violations based upon the WCCB routinely failing to obtain needed evaluations in a timely manner and over scheduling hearing times causing improper delay in the ability of parents to have a full hearing on the issue of whether their children are dependent." (Plaintiffs' Brief Response to WCCB Defendants, at 13-14.) Plaintiff avers that the procedural due process violations that took place in this case prevented Plaintiff from an opportunity to be heard at a meaningful time and in a meaningful manner regarding his fundamental liberty interest in the care, custody, and management of his children. See Miller, 174 F.3d at 373.

Plaintiff's expectation of having a meaningful opportunity to be heard on August 19th was thwarted by the fact that the hearing was continued so that the children could be evaluated. Thus, Plaintiff was unable to present his reasons supporting the return of his children to him until at least October 3, 2002. Plaintiff also claims that the WCCB Defendants delayed the time when he could gain custody of his children by failing to timely arrange for and provide the recommended therapy, which implicates Plaintiff's interest in the care and management of his children.

Plaintiff in part alleges that the harm suffered by his children and the subsequent need for therapy largely occurred as a result of the lengthy placement in the foster home. This raises the unique circumstance of this case that the father initiated contact with the WCCB to protect his children from perceived harm from a third party. It is not clear on the record before us if the recommended therapy had anything to do with the reasons why the WCCB took custody of the children initially. Clearly, grief counseling regarding the death of the children's mother was necessary, but hardly a reason by itself for finding the children dependent. Additionally, there was the father's unusual behavior concerning the initial telephone call to the WCCB, but that issue appears to have been addressed only during the July 11, 2002 hearing. We also note that the Court's finding of dependency made on October 10, 2002, relied on the case worker's very general

statements that this is a "family in need of individual therapy and family therapy"; that the "family has an ongoing need for grief counseling relative to the death" of the mother; and that the finding of dependency is based on "the evaluations and the need for continued services for the family." (Transcript of October 10, 2002 Hearing, at 7.)  Thus, Plaintiff's concern that his children needed therapy as a result of the WCCB Defendants' conduct is understandable.

In any event, Defendants argue that Plaintiff's procedural due process claim must fail because there was clear compliance with statutory requirements and because Plaintiff consented to the continuance of a hearing.  Defendants' argument hardly addresses the actual claims made by Plaintiff in his Amended Complaint.  Therefore, at this stage of the proceedings, we find that there is insufficient information to determine if there was an unjustified delay in providing therapy and proceeding with hearings that amounts to an unconstitutional due process violation.  We will therefore deny Defendants' motion to dismiss the procedural due process violation claim, except insofar as Plaintiff's claim is based on the delay between October 3rd and October 10th.  As set forth below, we find no constitutional violation in the  the seven-day delay from October 3rd to October 10th on its own.

### *Continuance of the October 3, 2002 Hearing*

The October 3, 2002 hearing was continued over the objection of Plaintiff to October 10, 2002.  Plaintiff questions why the hearing was scheduled on a day when the Court knew it only had one and half hours for the hearing.  In addition, Plaintiff avers that the WCCB knew it had two witnesses to present, Dr. Fialkov and the caseworker, while Plaintiff had four professional witnesses, and other lay witnesses.  (Plaintiffs' Brief Response to Fialkov, at 14.)  Thus, he argues that procedural due process requirements were not met.

Reviewing the circumstances of the October 3, 2002 continuance we disagree with Plaintiff that this delay constitutes a due process violation.  After hearing Plaintiff's attorney's objection to a continuance, the Court stated as follows:

> THE COURT:  Well, I'm granting the continuance.
>         When this was originally scheduled for today, my recollection when I was

20

speaking with all the attorneys is that they anticipated there would be an agreement.  I Told the attorneys at that time that we had an hour and a half, that we had a hearing in the morning and we had another hearing scheduled for the afternoon.  I believe that you were all present at that time and it was scheduled for today's date.

    This morning the hearing ran on until noontime.  We have another hearing this afternoon, so this will be continued until . . . . Thursday, October 10th.

(Transcript of Adjudication Hearing, October 3, 2002, at 6-7, attached as Ex. 3 to Plaintiffs'

Response to Fialkov's.)  The attorney for the WCCB explained as follows:

    . . . I do recall that, in fact, we had continued it also to get additional evaluations of the children.  It was our hope that it could be resolved, so we did schedule it from 10:30 until noon for that purpose as well.

(Id., at 8.)  The following exchange then occurred:

    THE COURT: And at that time you knew that I had a hearing in the afternoon because you were, in fact, the solicitor in the afternoon hearing?
    MS. GREC: Yes.
    THE COURT: Thank you.

(Id.)  Continuing directly after the Court stated "Thank you", Plaintiff's attorney explained her

understanding as follows:

    MS. CUNNINGHAM:  I'm not saying we didn't know that.  What I'm saying is I did attempt to contact your office to avoid a confusion today and we weren't able to do it, which is why I brought my witnesses.

(Id.)

    As can be seen, Plaintiff's attorney did not object to the Court's and Ms. Grec's recollection

of the circumstances of setting the hearing for October 3rd.  Plaintiff's attorney was present when

the hearing was scheduled, she knew it was set for an hour and half, she knew the children were to

be evaluated, and that after the evaluations the parties were anticipating resolving the matter and

coming to an agreement before October 3rd.  Had the parties resolved the matter and come to an

agreement as anticipated, the Court and the attorneys believed that an hour and half would have

been sufficient time.  It didn't work out that way.  However, it is not because of a constitutional due

process violation; rather it was because the parties did not resolve the matter and the Court

experienced a not unusual change in its schedule on the 3rd because an earlier hearing required going

past its scheduled time.  The delay from October 3, 2002 to October 10, 2002, does not support a

claim of a procedural due process violation.

### 2. First Amendment

With regard to Plaintiff's allegations of violations of the First Amendment, the "Third Circuit has recognized that 'family relationships are the paradigmatic form of protected intimate associations, as they "by their nature involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences and beliefs but also distinctively personal aspects of one's life."'" Behm v. Luzerne County Children & Youth Policy Makers, 172 F. Supp. 2d 575, 585 (M.D. Pa. 2001)(quoting Pi Lambda Phi Fraternity, Inc. v. University of Pittsburgh, 229 F.3d 435, 441-42 (2000) (quoting Roberts v. United States Jaycees, 468 U.S. 609, 615 (1984)). "First Amendment freedom of association includes the right to intimate association." Behm, 172 F. at 585 (citing Roberts, 468 U.S. at 619-20)).

Defendants argue that Plaintiff has not alleged any protected First Amendment conduct that has been violated. Defendants note that Plaintiff was not prevented from testifying, appearing, or having representation of counsel, and that his liberty interest in familial association was only interrupted at his own request. However, Plaintiff's claims concern the events that occurred after he telephoned the WCCB and after the WCCB had taken custody of his children. In addition, Plaintiff is not claiming a constitutional violation of his right to intimate association merely because his children were placed in foster care. See Behm, 172 F. at 585 (finding that Plaintiff had stated a First Amendment claim alleging a violation of the right to intimate association by placing children in foster home.)

Plaintiff alleges that Defendants violated his rights to familial association for essentially the same reasons as already stated: by keeping the children in the foster home when they should not have, and by unconstitutionally delaying therapy and hearings. Specifically, Plaintiff claims a violation of his rights to intimate association as a result of the Defendants prohibiting him from obtaining therapy for his children at a time when the Defendants knew the children needed therapy and were not providing it themselves.

In addition, Plaintiff alleges that the children's First Amendment rights were violated when the foster mother and the caseworker supervisor told the children not to talk to Spectrum employees about what goes on in the foster home. The above allegations clearly implicate Plaintiff's and his children's First Amendment rights. While in each of these cases the Defendants have a compelling state interest, "it is not clear that the state's interest could not be achieved through less restrictive means." Behn, 172 F. at 585. We thus will deny Defendants' motion to dismiss Plaintiff's First Amendment claims.

### 3. Fourth Amendment

Defendants argue that Plaintiff has failed to set forth a valid Fourth Amendment claim. We agree and note that Plaintiff does not address this claim, and thus implicitly concedes that he has not set forth a Fourth Amendment claim. Accordingly, we will grant Defendants' motion to dismiss Plaintiff's claims based on the Fourth Amendment.

### C.  Section 1983 Municipal Liability

"[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." Monell v. Department of Social Services, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037-38 (1978). Section 1983 "municipal liability attaches only 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'" Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990), quoting Monell, 436 U.S. at 694, 98 S.Ct. at 2037-38. Thus, a plaintiff must show that the municipality "maintained a policy or custom that caused a deprivation of constitutional rights." Doby v. DeCrescenzo, 171 F.3d 858, 867 (3d Cir. 1999), citing Monell, 436 U.S. at 694, 98 S.Ct. at 2037-38. "To establish the necessary causation, a plaintiff must demonstrate a 'plausible nexus' or 'affirmative link' between the municipality's custom and the specific deprivation of the constitutional rights at issue. Open Ends, Ltd. v. Chester County Sheriff's Department, 24 F.Supp.2d 410, 430 (E.D.Pa. 1998), citing Bielevicz, 915 F.2d at 850-51.

"Policy is made when a 'decisionmaker possessing final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990), quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986). "Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." Bielevicz, 915 F.2d at 850, citing Andrews, 895 F.2d at 1480 (other citations omitted). "In either of these cases, it is incumbent upon a plaintiff to show that a policymaker is responsible either for the policy or, through acquiescence, for the custom." Andrews, 895 F.2d at 1480.

Defendants argue that Plaintiff's section 1983 claims asserted against Westmoreland County and the WCCB must be dismissed because the Plaintiff fails to articulate the existence of an unconstitutional policy, custom or practice attributable to these entities.

Contrary to Defendants' statement, Plaintiff did make such an allegation. Plaintiff has not identified an express policy, proclamation or edict, but in his Amended Complaint he explicitly alleges that Westmoreland County, the WCCB, and the Westmoreland County Commissioners had a

> . . .well-established custom and/or policy, . . ., to fail and refuse to seriously investigate and act on complaints about foster placements and to use the implicit threat of prolonged placement of children outside of their parent's custody if the parent questions the decisions or authority of the Defendants.

(Am. Compl. ¶ 98.) He further claims that the other Defendants acted pursuant to this policy. (Am. Compl. ¶ 98.) In support of establishing the existence of the custom, Plaintiff alleges that Westmoreland County decision makers knew of that continued placement in the foster home would cause harm to the children, but Defendants failed to act.

Since Defendants' argument does not acknowledge Plaintiff's allegations, we cannot dismiss this claim at this stage of the proceedings. This is not to say that Plaintiff will be able to establish a given course of conduct by Defendants that is "so well-settled and permanent as virtually to constitute law." Bielevicz, 915 F.2d at 850. At the summary judgment stage it will be incumbent upon Plaintiff to identify and support with record evidence an unconstitutional policy, custom or

24

practice attributable to one or more of the relevant Defendants.  At this stage, it appears unlikely that Plaintiff will be able to ultimately support his municipal liability claim, however we conclude that we have no basis at this stage of the proceedings to dismiss Plaintiff's claim as asserted against the WCCB.

With regard to Westmoreland County and the Commissioners we see no set of facts that could be established upon which Plaintiff could be awarded relief.  Plaintiff attempts to claim that the County routinely ignored requests from the WCCB for assistance, but such a claim is insufficient to support a municipal liability claim against the County.  Accordingly, we will grant Defendants' motion to dismiss all claims asserted against Westmoreland County and the Westmoreland County Commissioners.

### D.  Section 1985 Conspiracy Claim

Plaintiff asserts that the Defendants conspired to violate his civil rights in violation of 42 U.S.C. § 1985.  Dr. Fialkov presented an argument to dismiss this claim for failure to state a claim upon which relief can be granted, but the argument is applicable to all Defendants.

> In stating a claim for conspiracy under Section 1985, "plaintiffs may not make bare conclusory allegations of conspiracy or concerted action, but are required to expressly allege an agreement or make averments of communication, consultation, cooperation or command from which such agreement can be inferred." Sayles v. Commonwealth of Pennsylvania Dept. of Public Welfare, County of Monroe, 24 F. Supp. 2d 393, 399 (M.D. Pa. 1997) [**33]  (Nealon, J.) (citing Flanagan v. Shively, 783 F. Supp. 922, 928 (M.D. Pa. 1992) aff'd 980 F.2d 722 (3d. Cir. 1992), cert. denied 510 U.S. 829, 114 S. Ct. 95, 126 L. Ed. 2d 62 (1993)). Such averments must include "allegations of the broad objectives [of the conspiracy and] the role each defendant allegedly played in carrying out those objectives." Sayles, 24 F. Supp. 2d at 399 (citing Flanagan, 783 F. Supp. at 928).

Behm v. Luzerne County Children & Youth Policy Makers, 172 F. Supp. 2d 575, 587-588 (D. Pa. 2001).

Plaintiff does not offer an argument in response, but instead merely refers the Court to the first 107 paragraphs of the Amended Complaint.  Our review of the Amended Complaint reveals that Plaintiff has "barely provided a broad allegation of conspiracy," and has "not provided any factual support showing the role of each defendant in the alleged conspiracy." Id. at 588 (citing Sayles, 24 F. Supp. 2d at 399).  Accordingly, we will grant Dr. Fialkov's motion to dismiss

Plaintiff's section 1985 claims as asserted against all Defendants.

### E.  Absolute and Qualified Immunity

At this stage of the proceedings, Plaintiff's claims of violations of procedural and substantive due process and the First Amendment have survived.  The individual Defendants, Sopko, McSparrin, Lojas, Abel, and Kempert, argue that they are protected by absolute immunity and/or qualified immunity.  As already explained, Defendants focus is on the initial decision to take custody of the children after the father telephoned the WCCB.  Accordingly, their argument is that "substantial evidence available to the caseworkers at the time was sufficient to create an 'objectively reasonable suspicion' that the minor plaintiffs were in danger, particularly since the plaintiff himself initiated the protective custody proceedings.  (Defendants' Brief in Support, at 17 (quoting Miller, 174 F.3d at 375-376)).  Since Plaintiff does not base any aspect of his claims on the fact that the Defendants initially took custody of his children, Defendants' argument focuses on the wrong facts and applies the wrong law.  Accordingly, we will deny Defendants' motion to dismiss at this stage of the proceedings.

### F.  Statute of Limitations

We will deny Defendants' motion to dismiss because the statue of limitations bars Plaintiff's claims prior to October 12, 2002.  It appears that Plaintiff was under a legal disability in bringing a claim on behalf of his children until January 9, 2003.

### G.  Right to Therapy and Placement in a Foster home

Defendants move to dismiss any claims by Plaintiff based on an alleged right to therapeutic and counseling services or on an alleged right to placement in a foster home.  Our review of the Amended Complaint shows that Plaintiff's allegations including the above terms are averred in support of Plaintiff's claims of violations of the family's liberty interest in family integrity and the right to be free from harm.  Insofar as Plaintiff's claims based solely on an alleged right to

therapeutic and counseling services, or solely on an alleged right to placement in a particular foster home, we agree that such claims fail to state a claim upon which relief can be granted.

### H. State Law Claims

#### 1. Intentional Infliction of Emotional Distress

In order to prevail on a claim of intentional infliction of emotional distress, a plaintiff "must, at the least, demonstrate intentional outrageous or extreme conduct by the defendant, which causes severe emotional distress to the plaintiff." Reeves v. Middletown Athletic Ass'n, 2004 PA Super 475, *17 (Pa.Super. 2004) (citing Hoy v. Angelone, 554 Pa. 134, 151 (Pa. 1998). "In addition, a plaintiff must suffer some type of resulting physical harm due to the defendant's outrageous conduct. Reeves, 2004 PA Super 475, *17 (citation omitted).

Defendants argue that Plaintiff can show neither the requisite conduct, nor the resulting physical harm.  Plaintiff argues that the requisite degree of conduct is satisfied by his allegations that the foster mother hated the younger child, threatened to not feed both children, and threatened to lock the younger child in a closet, or actually did lock the younger child in a closet.   Plaintiff also claims that his allegation of upset stomach is sufficient to satisfy the requisite physical harm.

Pennsylvania defines 'outrageous or extreme conduct' as conduct that is "so outrageous in character, so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in civilized society." Id. (quoting Hoy, at 151 (citing Buczek v. First Nat'l Bank of Mifflintown, 531 A.2d 1122, 1125 (Pa. Super. 1987)).  The Pennsylvania Supreme Court explained that another way to describe 'outrageous or extreme conduct' is: "'it has not been enough that the defendant has acted with intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort.'" Hoy, 554 Pa. at 151 (quoting Restatement (Second) of Torts § 46, comment d; Daughen v. Fox, 372 Pa. Super. 405, 412, 539 A.2d 858, 861 (1988).)

We find that the conduct alleged by Plaintiff does not rise to the level so as to be regarded as "atrocious, and utterly intolerable in civilized society."  We also conclude that Plaintiff's allegations of upset stomach are insufficient to satisfy the necessary harm to state a claim.  Accordingly, we will grant Defendants' motion to dismiss Plaintiff's claim of intentional infliction of emotional distress.

### 2.  Invasion of Privacy

"'An action for invasion of privacy is comprised of four distinct torts: (1) intrusion upon seclusion, (2) appropriation of name or likeness, (3) publicity given to private life and (4) publicity placing the person in a false light.'"  Kline v. Sec. Guards, Inc., 386 F.3d 246, 259-260 (3d Cir. 2004) (quoting Harris v. Easton Publishing Co., 483 A.2d 1377, 1383 (Pa. Super. Ct. 1984) (citing Marks v. Bell Tel. Co., 460 Pa. 73, 331 A.2d 424 (Pa. 1975); Vogel v. W.T. Grant Co., 458 Pa. 124, 327 A.2d 133, 136 (Pa. 1974))).

Plaintiff alleges two of the above four torts:  (1) Defendants intruded upon the children's seclusion in the bedrooms and bathrooms; and (2) the foster mother published the children's private life in the form of asking a neighbor to witness her communication with a Spectrum employee, or in otherwise publishing to others that the children were foster children.  Defendant argues that Plaintiff's claims must be dismissed for failure to state a claim.  We agree.

"The Pennsylvania courts have defined [intrusion upon seclusion], in accordance with the Restatement (Second) of Torts § 652B (1977), as follows: 'One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.'"  Kline, 386 F.3d at 260 (quoting Harris, 483 A.2d at 1383 (quoting Restatement (Second) of Torts § 652B)).  To maintain a claim for intrusion upon seclusion, "a plaintiff must show that (1) there was an intentional intrusion; (2) upon the solitude or seclusion of the plaintiff, or his private affairs or concerns; and (3) that the intrusion was substantial; and (4) highly offensive."  Tucker v. Merck & Co., 102 Fed. Appx. 247, 256 (3d Cir. 2004) (citing Larsen v. Philadelphia Newspapers, Inc., 543 A.2d 1181, 1186-87 (Pa. Super. 1988)).

We conclude that in a foster home where other children are present that an intrusion into a child's bedroom or bathroom does not rise to the level of "highly offensive" to sustain a claim of intrusion upon seclusion.   Accordingly, we will grant Defendants' motion to dismiss Plaintiff's claim.

To maintain a claim for publicity given to private life, a plaintiff must show that the publication was made "to the public at large or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." Vogel v. W.T. Grant Co., 327 A.2d 133, 137 (Pa. 1974) (citing  Restatement (Second) of Torts § 652D, comment b).  Publication to a small group of persons is insufficient.  Id.  Here, the only person the foster mother is alleged to have told that the children were foster children was a neighbor, who likely already knew the circumstances.  Plaintiff also generally alleges that the foster mother "published to others' that she was the foster mother of the children when she took them to the bus stop.  (Plaintiffs' Brief Response to WCCB Defendants, at 21.)  We find that such allegations fail to meet the required element of publication such that the matter becomes public knowledge.  Accordingly, we will grant Defendants' motion to dismiss Plaintiff's claims of publicity given to private life.

### 3.  Immunity under the Pennsylvania Political Subdivision Tort Claims Act

Defendants also move to dismiss Plaintiff's state law claims of intentional and negligent infliction of emotional distress and invasion of privacy as being barred by the Pennsylvania Political Subdivision Tort Claims Act, 42 Pa.C.S. §§ 8541-8564.  Plaintiff responds that he has alleged that the individual employees engaged in willful misconduct, which is an exception to the statutory immunity.  Based on our above determination that the state law claims fail to state a claim upon which relief can be granted we need not address this argument.

### I.  Defendant Foster Father N.D.

A review of the Amended Complaint shows that Plaintiff has not alleged any facts to support any claim against the foster father, N.D.  Accordingly, we will dismiss N.D. as a Defendant.

## IV.  Conclusion

For the reasons set forth above we will grant in part and deny in part Defendants' motions to dismiss.  Defendants Westmoreland County, the Westmoreland County Commissioners, Dr. Fialkov and N.D. will be dismissed from this action.  The remaining Defendants will be ordered to file an Answer to the Amended Complaint, which looks to be no easy task.  Plaintiff's lengthy and detailed Amended Complaint is hardly a model of a "short and plain statement of the claim showing that the pleader is entitled to relief" required by Federal Rule of Civil Procedure 8(a)(2).   Nor does the 125-paragraph, single-spaced Amended Complaint comply with the simple directives of Rule 10(b) that all averments be set forth in a paragraph "limited as far as practicable to a statement of a single set of circumstances."  As a result the Court had the task of dissecting a difficult and overly broad complaint, which only serves to delay Plaintiff's case.  Defendants, not to be outdone, filed a brief that in large part failed to address the averments of the Amended Complaint and instead erroneously focused on the WCCB initially taking custody of Plaintiff's children.  While Plaintiff has survived the instant motion to dismiss, we do not suggest that any Defendant is guilty of a violation, or that Plaintiff will be able to prove his allegations.  As the claims and issues in this action are sharpened it is likely that any worthy claims will become clear while the unsupportable claims will be dismissed.

An appropriate Order follows.

_December 14, 2005_
Date

_Maurice B. Cohill, Jr._
Maurice B. Cohill, Jr.,
Senior District Judge

30

### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| W.P.  Individually and On Behalf of and as Parent and Natural guardian of E.P. and W.T."H."P.,<br><br>Plaintiffs,<br><br>v.<br><br>WESTMORELAND COUNTY, PENNSYLVANIA, WESTMORELAND COUNTY COMMISSIONERS, WESTMORELAND COUNTY CHILDREN'S BUREAU, GERALD SOPKO, MARILYN McSPARRIN, KANDEE LOJAS, RYAN ABEL, KAREN KEMPERT, M.D. & N.D., FOSTER PARENTS, M. JEROME FIALKOV, M.D., WESTMORELAND COUNTY CHILDREN'S BUREAU POLICY MAKERS, JOHN DOE A, JOHN DOE B, ABC CORPORATION DEF, an UNINCORPORATED ASSOCIATION and GHI, a PARTNERSHIP<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  Civil No. 04-1562<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### Order

AND NOW, to-wit, this *14* day of December, 2005, for the reasons set forth in the Opinion accompanying this Order, it is hereby ORDERED, ADJUDGED, and DECREED as follows:

1.  The motion to dismiss filed by Defendant M. Jerome Fialkov, M.D (**Doc. 7**) be and hereby is GRANTED as to all Plaintiff's claims asserted against Dr. Fialkov for failure to state claim upon which relief can be granted.   M. Jerome Fialkov, M.D. is hereby dismissed as a party to this action.

**2.** The motion to dismiss filed by all Defendants except Dr. Fialkov (**Doc. 11**) be and hereby is GRANTED in part and DENIED in part as follows:

> a. Granted as to Plaintiff's claim of a violation of the Fourth Amendment;
>
> b. Granted as to Plaintiff's claim of section 1983 Municipal Liability against Westmoreland County and the Westmoreland County Commissioners;
>
> c. Granted as to Plaintiff's claim of a 42 U.S.C. § 1985 civil rights conspiracy claim;
>
> d. Granted as to Plaintiff's state law claims of intentional and negligent infliction of emotional distress and invasion of privacy ;
>
> e. Denied in all other respects.

**3.** Defendants Westmoreland County, the Westmoreland County Commissioners, and N.D. are hereby dismissed from this action.

IT IS FURTHER ORDERED that Defendants shall file an Answer to the Amended Complaint no later than January 18, 2006.

Maurice B. Cohill, Jr.
United States District Court Judge

cc:

2